The next case this morning is 25-1157, Lilliam v. Dish Network Corporation. Counsel for appellant, if you'd make your appearance and proceed with this. May it please the court, Christopher Jackson on behalf of the plaintiff's appellants. In the securities appeal, the district court erred when it granted the motion to dismiss because it misconstrued the challenge statements and took inferences in the defendant's favor. I'd like to focus on a couple of the key false statements. And the first set are those that we identified as statements number one and five in our chart. Those are the ones that Dish completed a successful field validation of the 5G network. Those statements are false because Dish did not complete a successful field validation. It only sent one text message and it didn't send data or voice or any other essential attribute of the network. And there are a few reasons why the district court erred in concluding otherwise. The first is that this is precisely the kind of factual allegation that must be taken in the plaintiff's favor at the pleading stage. The allegation that is that to a reasonable person, the phrase successful field validation isn't just sending a text message. It isn't just validating one attribute of the network, but all of the core or essential attributes. Well, does a reasonable person know that or is that something that requires some kind of expert testimony? I think it's true that a reasonable person knows it. Expert testimony would certainly be some evidence that past the pleading stage would be relevant in assessing that decision. There was some issue in your briefing about the word A. The word A was added to a successful field validation. Tell me about how that came about because initially you said that was added by the district judge and it wasn't in the actual text. Was it in the actual text? I believe that the word A was and I think there was a different clause that the district court added in the decision below. So it's true that the statement we're challenging, it says A successful field validation. And the reason why that would be false no matter what is that if a field validation means that you're validating all of the essential attributes of the network, saying A, putting it in the singular, that just means how many times did you do the validation? You still have to, if it's true as we're saying that field validation means validating everything, you've still got to validate everything at least once. So the fact that it says A field validation, I don't think that changes the question or the issue. Turning I think to that other point about what the district court added in its order. So what the district court said, and this is on addendum page seven, it said, quote, that the test was a successful field validation of a network functionality, namely text messaging. And it's the phrase of a network functionality, namely text messaging, that is not in the statement that we're challenging and that fundamentally changes the statement's meaning. It goes from A field validation to a particular, more limited scope of what a field validation would be. A network functionality rather than all of the core or essential functional attributes. Well, but is that what the statement says too? I mean, this full field, this field validation, is that defined anywhere? What does it even mean? So it's defined in our complaint. Well, but, okay, go ahead. Sure, Your Honor, on page 70. So we make just the factual allegation that a reasonable investor would understand field validation to mean what we're saying it means. In also in paragraph 70, we allege that confidential witness number two, who's part of this industry, that the confidential witness also understood like that it was their understanding as well that in the industry, successful field validation means all of the attributes in the network. Well, does that mean that a reasonable investor would understand the statement to be saying that the 5G network was fully functional? So I don't know if that's right. So yes, yes to a reasonable investor would understand what it is that we're alleging. I'm not sure that we're alleging, I mean, I don't think we're alleging that the statement was it was fully functioning. It was that it was a successful field validation period. So arguably, the phrase fully functioning might mean something greater or something different. Our challenge is limited directly to the statement of this. Well, do we have to accept the meaning of a sentence or a phrase because you allege what it means in your complaint or is it more a matter of this is what the statement, this was the statement, and then at that point, some determination has to be made as to what it means. But just because you allege it means something, is that something that at this stage of the proceedings, we just have to accept that? I think in this case, with this example, yes, that that's a sufficient reason to overturn the district court because the particular phrase we're talking about, a successful field validation, our inference is reasonable or our interpretation of it is reasonable. If we said a field validation meant something not in the field, that actually the words field validation meant something entirely different than those particular words meant, then I think the court can look to dictionaries, it can look to other items that it might take judicial notice of, and I think those are all fair arguments if the phrasing were different. You're saying your interpretation is reasonable, but isn't what we're talking about whether it's false or misleading? Correct. Well, those are two different things. I mean, to say something is false, I mean, I'm saying it's a green light. No, no, the light was red. I mean, well, the notion that a successful field validation, you define what field validation is in your complaint, and then you say they didn't do it. Well, how does that work? I mean, why do we have to accept, going back to Judge Matheson's point, why do we have to accept your definition of what that means? I think a couple of points, Chief Judge Holmes. So it's true that we say our inference is reasonable, but what our allegation is reasonable about what it means, but our allegation is that it carries only one meaning, that in the telecommunications industry, if you were a senior executive reporting to the general public and saying, we're building a 5G network, and we completed a successful field validation, that the only thing that means, the only assertion that it's making is that it was a validation of, not just pick a function, any function you want, but in fact, all of the essential attributes. I like that assertion, but the point would be, what facts did you plead to support the notion that that is the only meaning that it would have in the industry? You refer to one confidential informant who understood it to be that way, but if that's all you got, it seems to me that's not a lot. So I suppose disagreeing with that last provision, I think that is a sufficient reason, but there are other allegations that we've included. One confidential informant says that's what, this is my opinion, this is what I understand it to mean in the industry, is it not? So we do have other items, and I want to get to that in a minute, but to answer your question, yes, I think in this context it would, because again, a successful field validation, if you have, I guess this bleeds into the other arguments we have. So this is also the context of the statement that matters. What you have is senior executives of DISH who are reporting to the public, and they are talking about this make or break effort on behalf of DISH to build out a 5G network. This was the pivot from paid satellite TV into something entirely different. It was a make or break, it was the core operation of the company, and they were saying we're putting all of our eggs in this basket, we're building out in Las Vegas first, and we can happily report to you that we have committed, we have finished a successful field validation, and that we will commercially launch for enterprise customers in just a few months. And then after the fact, the other false statements that we allege, they continue to talk about the fact that they are making good progress. In that context, I don't think it is reasonable to infer that successful field validation means we just picked one attribute of the network. We, in fact, we know, like what we allege in our complaint is that the defendants knew when they made the assertion that there was a successful field validation, they knew that the network had no VONR, no voiceover network capabilities, and that it had no ability to transfer data. So what they knew is that they had a 5G cellular network that could not take cell phone calls, and that could not transfer data, do things like sending emails. And they're reporting to the public that it was a successful field validation. And I think particularly in a- So they didn't say anything about voiceover or phone calls, but your position means that a successful field validation has to include those things, or it's not a successful field validation. Is that your position? Yes, for a 5G network, in particular, yes. And because that is an essential or a core attribute of the network, which I don't understand the defendants- Other than a confidential informant saying this thing, is there something else in the industry? Is there some recognized industry published piece that tells us that? Nothing in the complaint, and I think- I mean, can experts disagree on that? I think experts often disagree in district courts. But I think, to piggyback off Chief Judge Holmes' question as well, these are the kinds of questions you can have an expert talk about that maybe- I mean, is it a term of art in the industry, successful field validation? I think it's true that it has one meaning. Term of art may carry additional baggage with it, but yes, that in this industry, it means one thing and one thing only, which is what we're saying. And I'd emphasize, too, that it's true that expert testimony would support our allegations of this fact. So I would anticipate that you could have an expert saying, in the telecommunications industry, when you're talking about a 5G network, this is what it means. But of course, that isn't in the complaint, that's later on. But it's really what was in the mind of the executive who said that in the email, right? Or said that in the- I mean, that's really what you have to prove. You have to prove, you agree, a heightened pleading standard for fraud, right? Correct, correct. Under the PSLRA, but those don't get to falsity. Those are only about scienter. So whether the defendants knew or recklessly disregarded the falsity of the statement. Did you address how the FCC deadlines affected the truth of the statement? Affected the truth of the statement? Of this particular statement, Your Honor? Yes. Yes, I think it goes to, I'm trying to think of how the, so broadly speaking, it's motive, or motive or I suppose the state of mind of the defendants. So what happened is, the defendants knew they had to pivot outside of paid satellite TV. They were doing this 5G network. And they really realized internally that they could not do both things at the same time. That they could not comply with what the FCC required them to do in order to hold on to their spectrum licenses. And then actually build out the network in a way that was feasible for commercial customers. So the FCC required a bare bones network that covered a certain portion of the country by a certain deadline. Enterprise customers, of course, required quite a bit more. It had to actually work for their businesses. And so they made the internal decision, we're gonna focus on, just build out the bare bones network so that we keep our licenses and don't lose billions of dollars in fines. And then on the other side, we know that we're giving up the fact that enterprise customers are never going to use this. That wasn't disclosed to the public. And so I think, turning back to statements one through five, one and five in particular, it emphasizes the fact that they were reporting essentially that they were doing the enterprise build out. Well, were they giving up on the fact that enterprise customers never would use it? I mean, is that really ultimately what happened? So, yes, I, it. Or was it just took longer than what people had hoped for? I don't wanna go outside of the complaint. It is true as a factual matter, outside of the complaint that it didn't work, that DISH ended up selling its spectrum licenses to, I believe, to SpaceX and AT&T for some significant sum. I realize that's not in the complaint, but in fact, it did not work at all. What I might turn to is the second set of false statements, unless the court has other questions on statements one through five in particular. There's another set I'd like to highlight. Those are statements 11 and 12, again, from our chart. And those are, they're similar, but I think in a little bit of a different. Well, counsel, at this point, I just need to ask you, you argue in your brief that the district court erred by addressing two statements as opposed to 19 statements. But didn't the district court address this motion based on the manner it was presented to the court? The manner it was presented? I think it, I'm not sure if I understand that the manner that it was presented to the court. Well, did you discuss on a statement-by-statement basis the 19 alleged misstatements in your motion papers, in your opposition to the motion to dismiss? Yes, and I think that all those statements were included and were part of the briefing. I think the other important point is that the district court, the court also, it understood that that was the way that we were presenting the issue as well. So it's true that- I thought the district court said that you had divided these into two categories, and then it selected a representative statement from each category. Right, and I think that's true, Your Honor, that there are, we can agree that the 19 false statements can broadly be broken up into different categories. All right, you're okay on that, but then you have this 24-page exhibit to your opposition, which is really where you lay out in detail the analysis, but it's an exhibit, and it's presented in bullet points, and I guess my question to you is, confronted with that format and presentation, why wasn't the district judge reasonable in the way he approached this issue? Because I think you're arguing that we should reverse and instruct the district judge to take these one by one, but this is a lot to expect anyone to untangle in your 24-page exhibit A. So, yes, and it is true that we are appealing the fact that the district court only considered two of the statements. I'm not sure, I wouldn't go as far as Judge Matheson, you were suggesting that we were arguing that the court has to go through every single statement in the same level, but I think that there are critical differences, and so to give just one example, the statement one through five was about the network. There are other statements that are specific about VONR, the voiceover network capability that the network can. There are also statements about software development. There are other. Well, okay, I need to, now we're sort of, I was thinking, well, there's either we take the 19 statements or we take two statements, and you're somewhere in between at this point, but my question really went to whether it was reasonable for the district court to analyze your complaint and ultimately grant the motion in the manner in which it did, or are you saying that that was wrong to do it that way? Right, may I answer? Yes, please. It was not correct for the district court to only consider those two, but I don't take them, I think, farther position that it had to analyze all 19 statements to the same degree. I think that it could have grouped them into things like software, VONR, enterprise customers, maybe four categories or five, something like that, that that's the minimum level of specificity that would be required, and that just picking two when those categories are very broad wasn't sufficient because there were important details about, for example, software. Well, I mean, you're highlighting here, granted in a time-limited argument, four. Are you saying that there were more than four statements the district court had to consider? I mean, than the one, five, 11, 12? Yes, I mean, so I tried to order them by what we viewed as importance, and yes, 11 and 12 was the next set, and then statement 18, which the district court identified, and then, for example, statements two, three, and four, those are, they're in the district court's overall fourth category, or sorry, first category, but those are about integration, about bringing radios, compute, and software together. In our view, that's very different than talking about the field validation. So our argument is the district court, it grouped building the network together, but under building the network, you've got software, you've got voiceover radio, you've got integration, different things that I think, in fairness, the district court needed to look at those because there are different arguments and different statements about each of those. And I wanna talk, I know you're over in time, but we'll try to be a little flexible on that. All right, before I go on to ask a question about CNJER, what remedy would you expect to have out of this? I mean, if we were to say, oh, well, the court should have done four, five, as opposed to two, one, or two, I mean, would you say that that was error that required us to remand for the district court to do a more fulsome analysis? Is that what would happen? I mean, you're not gonna ask us to do it, right? Well, Your Honor, yes, that is what, as to our first argument that the district court didn't do a thorough enough review of each of the statements, that is one tack the court would take. I will say we certainly would prefer, because the court can review this de novo as a complaint, that it could just find that these are sufficient to establish falsity in CNJER. That would, of course, And did you clarify in your briefing what these categories of statements would be that you would think would be sufficient for us to consider? You were talking about, you know, well, we could have done a number here, a number here, a number here in terms of buckets. If we were to do that, if we were to say error, we should do that, is that clear from your briefing how that would play out? No, no, if I understand the court's question, I think, no, that we did not propose a separate, you know, a more detailed set of buckets. Categorization. No, we did not do that. Okay. Because our argument was, there are probably a couple of different ways the district court could do that. We don't want to say there's one particular way. Our argument is only breaking them into two broad buckets, that that was too broad of a brush. Got it, but you didn't provide guidance to us on how we should do it if we would propose to do it, right? I think, no, Your Honor, I think that our argument was, or is that the statements, you know, in the first place, they do establish both falsity and scienter, and so there's sufficient allegations in the complaint for the court to find that it does state a claim, even under the PSLRA's height claims. Okay, let me go on to scienter for a quick second, but you did not adopt this sort of enumerated approach as it relates to your scienter argument in briefing. I mean, you, in fact, had categories of things that you had said established the fact that there was adequate scienter, but you didn't go statement by statement in explaining why these statements reflected scienter, so you adopted a different approach here for which your opponent actually found fault in that. So I think we do have a separate argument on scienter. We did, in the false statements, I believe, in the briefing, also discuss that as to them. I acknowledge it's certainly not, it's just, it's a question of page limits in briefing if you want to make sure that you explain the points of scienter somewhere, and so we had both, in the particular false statements, we had an explanation, and then we had a broader one just as its own standalone section, explaining that the defendants knew, broadly speaking, that the network was not functioning the way they were representing it. And so you're saying in your section of the enumeration of statements, you included a scienter argument as well? Yes, in the argument section, is that? I guess the point I'm making is, in the part of your brief that speaks scienter, there is not a statement by statement saying, this statement A, one, the scienter is reflected as it relates to this statement one by X. Correct. And so you did not do that, right? In the separate section on scienter, that is correct, yes. Okay, okay, did you do that anywhere in your brief? Yeah, yes, I believe that, I apologize that I don't have the whole thing to give you a particular citation, but I believe that, yes, when we made the false statements, that we discussed the falsity of the statements, that there are discussions about why the defendants knew they were false as well. Those were much more abbreviated discussions because we pulled all of the allegations we had about scienter and put them into. Well, okay, why they knew they were false, but that doesn't, scienter is not necessarily why they knew they were false, right? They had to intend to deceive, right? I think that they have to know that the statement was false or be recklessly disregarding of the fact that it was false. We don't have to allege separately a motive about why they would have decided to make those statements false. And on the question of scienter, what, beyond you had C, confidential informant three, beyond that, what did you have? And how did confidential informant three be situated to have knowledge to allow him to have scienter, he or she? So confidential witness three, I think in particular, sat in on both the, I believe it was weekly software meetings and biweekly 5G network meetings. And I think the important point to emphasize there is that in other securities cases, it's the defendants passively receiving information and courts understandably are worried maybe they didn't absorb it. They receive lots of information. How do you know that they knew it? What we have here with particular with a confidential witness three is allegations about how the defendants were engaging. We're saying, why are there so many defects? Let's go through the jury tickets together. So the defendants are actively responding to the information that is being provided to them. They're not simply passive recipients of the information that they are being provided. And that I think is a very strong inference of scienter. The other smaller point I'd make on that is that Mr. Ergin in particular said, like he publicly disclosed, we go through, or I go through the tickets, the jury tickets about defects every day. So he's actually on record saying, I go through these tickets every day. And I think that's a very strong inference that in fact, they knew the problems that we're pointing to because he was actively going through everything. Thank you.  Good morning. May it please the court, Brian Frawley for defendants appellees. The well-reasoned decision of the district court here should be affirmed for at least two independent reasons. First, as was the bulk of this discussion this morning, plaintiffs do not plead facts showing that any actual dish statement was objectively false, misleading, or demonstrate that dishes forward-looking statements and puffery are actionable under the PSLRA in this court's precedence. Second, we heard very little this morning from Mike Friend about scienter. And that's because they have very little to say on the subject, as was obvious from that colloquy. They do not plead specific facts giving rise to any strong inference of scienter. And they certainly do not even engage in the balancing test that's required by the Supreme Court and this court's precedence. Mr. Frawley, could we focus on the scienter question for a moment, and in particular, opposing counsel's comments about how the speakers, the managers of dish, were present in meetings that CW3 saw. Well, I wanna get at the question of, even assuming, as CW3 said, there was certain levels of engagement. As a matter of law, is that enough? No, Judge Holmes, it is not. This court has said repeatedly in both of the Spirit Airlines' decisions in Weinstein and Fleming that attendance at meetings is not enough. And the reason that's not enough is that you have to show what the content of the information was that was conveyed to the speaker contemporaneously with the statement. And as Your Honor pointed out, the scienter in this circuit is not just knowledge of adverse facts. It's knowledge that the statement is likely of a substantial risk of misleading a reasonable investor. There are two parts of just the cogent and compelling inference of fraud part of the scienter analysis. Whatever happened at those meetings, which is not described in the complaint or in the briefs, they say meetings took place over a two-year period and they talked about defects. They don't talk about how any speaker knew what those defects were, knew they were insurmountable. As this court ruled in pluralsight, none of that comes even close to showing knowledge of a misstatement. Just because things are going wrong, just because delays are occurring, doesn't say that the delays are not capable of being overcome, doesn't say the technological difficulties can't be overcome. It doesn't even show knowledge of an adverse fact. This may be an extreme example, but what I'm thinking about is a scenario in which one of the speakers was in that meeting, he heard these adverse facts, and asked questions about the adverse facts. That's one scenario. The other scenario is that speaker asked questions about the adverse facts and then says, well, I think we are really sunk. Turns around and makes a statement to the contrary and to the public. That latter scenario, I take it, there's no disagreement, there would be scienter out of that. I think that's probably correct, Your Honor, and that's more similar to Your Honor's opinion in the SEC versus Jen Audio's decision where somebody made up facts, knew the adverse facts, doctored evidence to make up support for his version of the events, and then lied to investors. What the best case the plaintiffs have here is that defects were found remarkably in a network that nobody ever built before that was gonna be built in a three times quicker than anybody had ever built it before. Defects arose. The defendant said in every single one of those earning calls that are in the record in the appendix, we have problems. We're gonna have problems. The problems are gonna arise and then we're gonna try to fix it. The record here doesn't support the way the plaintiffs are portraying this in any way, shape, or form. I guess what my question was designed to get at is in part the notion of, and you alluded to this some, I take it under the law, it's not enough that you know bad facts. There has to be evidence that you drew an inference that would be counter to what you later articulate, right? That is correct, Your Honor, and this Court has made that clear on a number of occasions, that you have to know the adverse facts and know that your version of the events was likely to mislead an investor. We haven't had either of those two elements here. There's no pleading of specific facts, of specific pieces of information that contradicted with what anybody said, and it would be almost impossible to do so. The fact that we had a 17 minutes of argument this morning about how somebody interprets the word field validation, how could you ever plead? You were timing it? I want you right there. How could you ever plead that the speaker knew that was going to mislead somebody when nobody can say what it means? What's your response? I mean, the plaintiff in this case, the appellant says, there's only one way to interpret the terms a successful field validation and or a network functionality. What's the response to that on your side? Well, Your Honor, first of all, let's start with their complaint. This is what their complaint says. This is paragraph 122. A text message was sent to DISH's headquarters to validate that the 5G network was functional. So a text message was sent from the field to DISH to validate the network. What part of that is in a field validation? I don't understand, but the argument as we heard it this morning in response to Judge Holmes' questions, they say that CW3 says that this has some unique meaning that some technical people know about. As was pointed out, there's no argument that's what a reasonable investor knows. But the argument here has always been that you need to read the context, but the context entirely refutes what they just argued to this morning. The network didn't exist. In December of 2020, the network was gonna start construction in April of 2021. There was no network. How could anybody interpret that to have tested all of the network, all of its functionality, voice on a network that doesn't exist? How could anybody interpret it that way? They can't. But more importantly, as I think Judge Holmes also pointed out, in Hampton, this court said, showing that there's two alternative conclusions from a statement doesn't plead a misstatement. That's not pleading a misstatement. They need to plead specific facts that their version is the right one, not a one, the right one. The Tesla case from the Ninth Circuit says that as well. Part of the problem here with this is that the plaintiffs have a sort of fundamental flaw in the whole theory that they're espousing here. They're contrasting two entirely different things. The save the license mantra that was the subject of their briefs has nothing to do with the Vegas market, which was the subject of all of Dish's comments about its network. Nothing about Vegas was saving the license. Vegas was being built in 2021. The first hurdle in the FCC license requirements wasn't until June of 2022. And the second one went out until June of 2023. Vegas had nothing to do with saving the license. And Vegas was operational, open to consumers in May of 2022, so it couldn't. Counsel, could I just ask you this? It seems, at least at some points, that the appellants are arguing falsity by omission. In other words, on the field validation statement, omission of information about lack of software integration, or omission of information about lack of functionality, or inability to launch by the third quarter of the next year. So it seems that there are these affirmative arguments about false statements, but there's also these arguments about material omissions. Could you address that, please? Yes, Judge Mattson, I was hoping to get to that anyway. I want to unpack that a little bit. So to start with the first part of your question, that's not a viable claim under the securities laws. An accurate statement cannot be misleading by omission. That's McDonald and Williams from this court. The omission has to show that the actual statement was false. Not that it was incomplete, not that there were nice information I would have liked to have known. The statement has to have been misleading on its own. And a field validation isn't misleading on its own. And any of the other statements that they refer to isn't either. It has to have been misleading without the addition of information. That's correct, Your Honor. For example, in Hampton, this court said that the use of propriety in reference to a transaction was not false because the plaintiffs hadn't shown that the label doesn't fit the product. They can't plead a misstatement just by merely alleging that investors may ascribe a different meaning to the statement. Again, in Hampton, this court said that an article with an alternative conclusion doesn't show that the statement was untrue or even misleading. The misleading fact has to change, the omission has to change what was actually said. But that's why the context here matters so much. Plaintiffs say that all of these statements implied that DISH had done so much, but as I alluded to earlier, there was no network. The same statement said we're gonna start building in a couple of months. It couldn't mean that we tested or all of this stuff works. They also say that the field validation and bringing network software together all implied that we had a fully integrated network, it was all built and it was integrated. But again, DISH said the opposite. This is quoted at page 34 of our brief, it's 80 of the appendix. DISH said that it would first build a network, then it would put the pieces together, and then we'd see if it worked. This is what it says. Once you get through the transition stage, it's all about execution. And there's certainly significant risk for us as we go execute. We have to first deploy our network, then we gotta put it all together to make it work, and there's certainly gonna be substantial risk, there's certainly gonna be a lot of problems. DISH said once built, the network wouldn't be running but crawling. It told investors to be skeptical because we had never done this before. What they say the statements implied is impossible given what DISH actually said. Not even implausible, impossible. In Williams, this court said there's no misstatement because the defendants, quote, made quite explicit what further steps were necessary. The same thing is true here. Judge Matheson also asked about the statement about a projected third quarter launch. On its face, that's a projection. It's covered by the PSLRA safe harbor, and the plaintiffs waived any argument about that by not briefing the question. But it's also not shown to be false. The only thing that they based their entire claim, that DISH didn't have a basis to project a third quarter launch, is one CW, and this court's statement is to say that an unidentified CW can't be the sole source of a misstatement. But all that CW says is that there was a technological change from an existing cloud vendor to Amazon, and that made a third quarter launch implausible, improbable, whatever the words he wished to use. Counsel, could I just ask on the CW question, leaving aside the sole source point that you just made, on a motion to dismiss when the complaint relies on a CW, what is it permissible for a court to consider whether the complaint has adequately supported reliance on a CW from the standpoint of reliability, credibility, or is that something that's not appropriate to consider at that procedural stage? So the first half of your question is yes, and the second half is no, so let me go through that. Credibility determinations clearly are not part of the motion to dismiss process, whether it be a CW or anybody else. But the district court is, and Adams and Hampton made this clear, that when you have unattributed sources, whether it be a CW or just references to internal reports without any indication about the source or reliability of them, it's part of the particularity review that the court does. And this court has said repeatedly in Adams and Hampton that when you have unattributed sources, whether they be CWs or other things, that we look for more than one, and we look for other indicia of reliability in determining whether or not as a particular is pleading of a misstatement. And we submit here whether you credit CW at his word or you cast some doubt about them because he's alone. There's nothing remotely here that shows a misstatement whatsoever. And there's a distinction, right, between credibility and the question of whether the CW was actually situated to see the things that they saw, whether they were situated to have contact with players such that they could be able to make a conclusion, right? Right, and that plays even more so into the scienter point. But you are right, Judge Holmes, and particularly in both of the Spirit Airlines cases, this court made clear that when you have CWs that are not very close to the speaker, so they won't know what other information the speaker has, that you should, that we don't typically credit those kinds of CWs in this court in either finding a misstatement or in finding scienter. And just before, as my time is up here, I want to get to one more part of the scienter argument. And that's fairly generous with the other side. So if you want to take a few minutes, three minutes tops, you can do that. That's fine, Your Honor. I think that I probably have covered most of what I'd like to cover, but the ultimate conclusion in the scienter analysis requires a so-called tell that balancing, and that is looking at the inference of scienter presented by the plaintiffs. And there must be a cogent and compelling inference of scienter before you get to balancing. But even if you were to assume that they got there and they didn't, under this course precedence, there is no way to perform the tell that balancing and find a strong inference of scienter here. We talked before about the ambiguity of the statements and Wolf, Weinstein, Nakumpton, this court has said repeatedly that ambiguous statements are ill-suited to support a scienter. The Supreme Court said so in tell labs itself. It says ambiguity and omissions count against scienter. There's the absence of motive, which we haven't talked about yet, but this court has repeatedly found that dispositive. In McNamara, Williams, Small, and in Gold Resources, this court said that the fact that an 18% stockholder was not alleged to have sold his shares, and that was actually all the defendants collectively, refutes scienter. Here, Mr. Ergin owned 52% of Dish's equity. By plaintiff's theory, he was the orchestrate of his own fraud. He was the worst outcome of anybody in this situation from his own fraud. It makes no sense. And this court has said repeatedly, fraud theories that make no sense do not have a compelling inference of fraud. And then the last thing is Dish. Clarify that for me. Put a fine point on it. Why would it make no sense? He owns 52%, but why would it make no sense? There's nothing to be gained. There's not only nothing to be gained out of this fraud where you are trying to artificially inflate the stock in order to deflate it two years later. His stock holdings didn't change. So he not only didn't get anything out of it, he just put off to the future of the inevitable in order to incur losses later by their theory. As a stockholder, he's not alleged to have transacted in Dish's stock in any way, shape, or form, and so he not only didn't benefit it, but if they're right that this fraud produced losses for the Dish equity holders, he was 52% of those equity holders. And lastly, this court has said repeatedly that a company's candor about risks in its business strongly undermines a center as well. As in Anderson and Gold Resources, this court said the risks of the business were fully laid out for investors. As our brief makes clear, that's true in spades here. Counsel, I know you're over time, but could you just take a few seconds to address the addressing two statements versus 19 statements issue? Sure, Your Honor. So as seasoned appellate jurist, I think this court is well aware of the judges and a chief judge of the trial court are often faced with pleadings with 19 statements and sort of have to do some balancing. This court does it all the time. It did so in level three. It did so in the Spirit Airlines cases, but it doesn't really matter because that's not what the district court did. If you read the court's opinion, it makes conclusions about the entirety of the complaint. It says that it read the entirety of the complaint. It says the entirety of the complaint does not state a cause of action, a misstatement, or scienter. It took what it perceived to be the two best cases in plaintiff's categories and addressed them specifically as an example. And the plaintiff here frankly endorses that because my friend here basically described all of their misstatements in buckets. So it's a little hubris to complain about what the district court did when that's the way they presented their case in the district court, and they did so again here. But apart from all of that, it doesn't matter. This court's review is de novo. However the district court went about reviewing these claims doesn't matter. It's not a basis for any reversal or finding a reversible error. It's just a way for my colleagues to avoid pleading a case for each one of their misstatements. Thank you, Your Honors. Thank you. The case is submitted.  No. Case is submitted. Thank you for your kind arguments.